**J.P., and all others similarly situated, et al., Plaintiffs,**

v.

**TAFT, et al., Defendants.**

**No. C2–04–692.**

United States District Court, S.D. Ohio, Eastern Division.

July 21, 2006.

See, also, 2006 WL 1867383.

Jennifer M. Kinsley, Sirkin Pinales & Schwartz, Cincinnati, OH, Kimberly Brooks Tandy, Children's Law Center, Covington, KY, Stephen L. Pevar, American Civil Liberties Union Foundation, Hartford, CT, for Plaintiffs.

Joseph M. Mancini, Philip A. King, Ohio Attorney General, Geoffrey J. Moul, Murray Murphy Moul & Basil, Columbus, OH, Mary Anne Reese, Attorney General of Ohio, Cincinnati, OH, for Defendants.

### *ORDER AND OPINION*

· MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on the Defendants' Third Motion for Summary

Judgment.[1] For the reasons set forth herein, the Court **DENIES** Defendants' Third Motion for Summary Judgment.

## II. STATEMENT OF FACTS

### A. Background

Defendant, Ohio Department of Youth Services ("ODYS") serves as that "legal custodian for [Ohio] juvenile offenders, age 10–21 who have been adjudicated delinquent as a result of committing felony violations." Pl.'s Ex. A. ODYS operates by fund or contract institutions including but not limited to: Circleville Juvenile Correctional facility, Mohican Juvenile Correctional facility, Cuyahoga Hills Juvenile Correctional Facility, Scioto Juvenile Correctional Facility, Ohio River Valley Juvenile Correctional Facility, Indian River Juvenile Correctional Facility, Freedom Center, and the Marion Juvenile Correctional Facility. See Pls.' Ex. A.[2] ODYS also has six parole offices, and contracts with a private sector provider for services. See id. "At any given time, [Ohio] DYS has approximately 1,800 youth[3] in its custody in the correctional facilities [listed above]." Id.

In 1992, the Sixth Circuit Court of Appeals ruled that because juvenile offenders cannot make effective use of legal materials by themselves, they require the assistance of lawyers to allow them meaningful access to the courts. See John L. v. Adams, 969 F.2d 228, 233 (6th Cir.1992).[4]

---

1. Though Plaintiffs initially filed suit against Governor Taft, Thomas Stickrath, the interim Director of ODYS, and ODYS, on April 21, 2006, this Court **GRANTED** Defendant Taft's Second Motion to Dismiss him as a Defendant to this action. [Doc. No. 126]. Accordingly, Defendant Stickrath, and Defendant ODYS are the only remaining defendants in the case.

2. These institutions are state facilities created by the Ohio General Assembly under the management and control of either ODYS or a private entity with which ODYS contracted for institutional care and custody of felony delinquents. Second Amended Complaint 19. In addition to maintaining these facilities, ODYS supervises committed juveniles housed in institutions or community corrections facilities throughout the state of Ohio. Id.

3. Juveniles who are adjudicated delinquent for committing acts that if committed by an adult would constitute felonies, may be committed to ODYS for an indefinite period of time up to and until that juvenile reaches the age of 21. Second Amended Complaint 21. Juveniles who have been adjudicated felony delinquents are eligible for placement at community corrections facilities. Id. 22. A felony delinquent is a juvenile at least 12 years of age and less than 18 years of age, who has been adjudicated a delinquent juvenile for committing an act that if committed by an adult would be a felony offense, or an adult between the ages of 18 and 21 who is in the legal custody of ODYS, and has committed an act while in custody that would constitute a felony if committed by an adult. Id. Juveniles committed to ODYS range in age from 12 to 21 years. Id. 23. Placement in an institution or community corrections facility can range from several months to several years and averages approximately 10½ months per stay. Id. The average age of admission in Ohio is 15.9 years. Id.

4. In John L., plaintiffs, incarcerated juveniles who were or would soon be confined in secure institutions operated by Tennessee Department of Youth Development ("TDYD") brought a class action alleging denial of right of access to the courts. See 969 F.2d at 228. The district court granted summary judgment to the plaintiffs and ordered the state to submit a proposed remedial plan to provide plaintiffs with an appropriate remedy. Id. at 229. After giving plaintiffs an opportunity to weigh in on the proposed remedial plan, the judge fashioned it into a "remedial order."

Under the terms of the approved remedial order, the TDYD would create four separate contracts to have private attorneys provide part-time legal assistance to juveniles at the four secure Tennessee institutions. Id. Further, the function of these contract attorneys would be to speak with juveniles who requested to talk with an attorney, to perform the factual and legal research necessary to com-

Nonetheless, this right to assistance of counsel has been narrowly interpreted to mean that juvenile offenders are not entitled to legal assistance on "general civil matters arising solely under state law." *Id.* Moreover, the right to assistance of counsel is limited to "the preparation and the filing of the complaint." *See Knop v. Johnson,* 977 F.2d 996, 1005–07 (6th Cir. 1992); *see also, Bee v. Utah State Prison,* 823 F.2d 397 (10th Cir.1987); *Nordgren v. Milliken,* 762 F.2d 851, 855 (10th Cir. 1985); *Ward v. Kort,* 762 F.2d 856 (10th Cir.1985).

## B. Procedural History

### 1. The Initial Lawsuit

In July 2004, four youth (J.P., S.J., H.H. and D.B.) filed a proposed class action suit in federal court. *See* Complaint. Plaintiffs alleged that the Defendants violated the First, Sixth, and Fourteenth Amendments of the United States Constitution and corresponding provisions of the Ohio Constitution by denying access to the courts to juveniles committed to ODYS as juvenile delinquents or serious juvenile offenders. *See id.; J.P., et al.,* 2005 WL 2405993, at *1. Plaintiffs sought declaratory and injunctive relief, asking the Court to declare Defendants' actions unconstitutional and to require Defendants to provide them with access to attorneys. *See id.*

On January 7, 2005, Defendants filed their First Motion for Summary Judgment in which they argued that the four Plaintiffs named in the Complaint had failed to exhaust their administrative remedies and, therefore, lacked standing to challenge Defendants' legal assistance program. *See* Defs.' First Motion for Summary Judgment. Plaintiffs responded to Defendants' motion. *See* Pls.' Opp. to Defs.' First Motion for Summary Judgment.

Taking Plaintiffs' pending claims into account, Defendants made extensive changes to the ODYS legal assistance program,[5] and, on January 12, 2005, they filed their Second Motion for Summary Judgment, in which they argued that the four Plaintiffs named in the initial Complaint lacked standing to sue. *See* Defs.' Second Motion

ply with Rule 11, and either to advise a juvenile that he or she does not have a meritorious claim or to prepare for appointment of counsel. *Id.* Finally, though use of the grievance procedures established at each institution was not required, attorneys were instructed to "urge use" of those procedures to solve any and all claims." *Id.*

The Sixth Circuit affirmed the district court's decision granting summary judgment to plaintiffs, but reversed the district court's remedial order to the extent that it required the State to provide assistance to juvenile detainees for Section 1983 claims unrelated to their detention and civil matters involving purely state law. *Id.* at 237.

**5.** The interim changes are as follows:

ODYS entered into a contract with attorney Larry Matthews in September 2004, approximately one year ago[, September 2004,] to provide legal assistance to youth with regard to conditions of confinement. Mr. Mathews travels to each institution on a bi-weekly basis to talk to the inmates about issues related to conditions of their confinement. Since September, Mr. Mathews has conducted an orientation at each facility with youth and staff and has met with youth individually and in groups to discuss legal issues and to assist them in filing or resolving grievances. In addition, ODYS has hired at least one other contract attorney, Sharon Hicks [("Hicks")] ... Further, ODYS has hired a youth advocate to act on behalf of the youths to ensure that their grievances are processed and addressed at all levels. Finally, ODYS has also hired a Compliance Officer to oversee the implementation of the legal assistance program and all new initiatives directed at improving conditions of confinement. *See J.P. v. Taft,* 2005 WL 2405993, at *14 (S.D.Ohio Sept.29, 2005) (internal citations omitted).

for Summary Judgment.[6] Shortly thereafter, on March 7, 2005, Plaintiffs filed their first Amended Complaint, adding M.M. and T.M. as named plaintiffs.[7] Plaintiffs also served Defendants with a written discovery request in an effort to "probe the content, scope, and operation of [the Defendants'] new program." *See* Pls.' Motion at 5; Pls.' Ex. A. Plaintiffs requested that Defendants produce the contract between ODYS and program attorneys, Larry Mathews ("Mathews") and Sharon Hicks ("Hicks"), so that Plaintiffs could "assess the scope of [the attorneys'] duties," as well as a description of any and all legal services the new ODYS legal services program was to provide in order to determine whether it, in fact, met the requirements of the law. Pls.' Motion at 5. In response, Defendants filed a motion to stay all discovery, which the Court subsequently granted. *Id.*

Defendants filed their Third Motion for Summary Judgment on August 1, 2005 in which they reiterated their previous assertions and insisted that M.M. and T.M., the two additional named plaintiffs, lacked standing. *See* Pls.' Motion at 5–6; Defs.' Third Motion for Summary Judgment. In response, Plaintiffs, once again, sought to "engage in discovery designed to uncover the content, scope, and operation of Defendants' new legal assistance program, and served Defendants with a *second* request for production of documents along with a

first set of interrogatories." *See* Pls.' Motion at 6; Pls' Reply to Defs.' Response to Pls.' Motion for Extension of Time. In making their discovery request, Plaintiffs sought both an extension to the period of discovery set in the Court's preliminary pretrial order and an extension of time to respond to Defendants' Third Motion for Summary Judgment. *See* Pls.' Motion at 6; Pls.' Motion to Extend Discovery; Pls' Motion for Extension.

On February 7, 2005, the Court held a telephonic hearing and ruled, *inter alia,* that Plaintiffs could not engage in any discovery regarding Defendants' new legal assistance program, issuing a protective order to that effect. *See* Pls.' Motion at 1. The Court held that before any such discovery could occur, the parties and the Court needed to address the issues of jurisdiction, standing, and the exhaustion of administrative remedies present in Defendants' various motions for summary judgment. *Id.*

### 2. The Second Amended Complaint

With the Court's permission, Plaintiffs filed their seconded amended complaint on May 18, 2005. *See* Pls.' Second Amended Complaint; *see supra* note 7. Shortly thereafter, Defendants filed a motion requesting disqualification of Plaintiffs' Attorney, Kim Brooks Tandy for causing herself to become a material witness in the

---

6. According to the Defendants, the Plaintiffs lacked standing because they,

> ... failed to demonstrate that they have suffered any litigation-related injury as a result of the [D]efendants' actions. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Pilgrim v. Littlefield,* 92 F.3d 413 (6th Cir.1996). No violation of the right of access to the courts occurs in the absence of injury. This means that, without evidence that the [D]efendants prevented the [P]laintiffs from filing suit on their underlying claims or rendered their access to the courts ineffective or meaning-

less, [P]laintiffs have not shown that their right of access to the courts has been violated. *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002); *Swekel v. City of River Rouge,* 119 F.3d 1259 (6th Cir.1997).

Defs.' Second Motion for Summary Judgment at 2.

7. The first Amended Complaint [Doc. No. 40] was terminated on March 8, 2005 and later replaced by Plaintiffs' Second Amended Complaint [Doc. No. 77].

case. *See* Defs.' Motion to Disqualify Plaintiffs' Counsel.

On September 29, 2005, this Court granted Defendants' Second Motion for Summary Judgment based on the Court's lack of subject matter jurisdiction to entertain Plaintiffs' claims. *See J.P.*, 2005 WL 2405993, at *19.[8] In so holding, the Court also denied as moot Defendants' First Motion for Summary Judgment,[9] and Defendants' Motion to Disqualify Kim Brooks Tandy as Plaintiffs' Counsel. *Id.* Finally, the Court also dismissed, without prejudice, Plaintiffs' Motion for Class Certification, noting that Plaintiffs may have an opportunity to re-file the motion following the Court's resolution of the Defendants' Third Motion for Summary Judgment. *Id.*

On March 15, 2006 the Court denied both Plaintiffs' Motion to Table the Court's Preliminary Pretrial Order, and Plaintiffs' Rule 59 Motion to Alter or Amend the Court's September 29, 2005 Opinion and Order. Also, on April 21, 2006, the Court granted Defendant Taft's Motion to Dismiss, dismissing all counts brought against Governor Taft, leaving Defendant Stick-

rath and Defendant ODYS as the sole defendants. *See supra* note 1.

**3. Facts Regarding T.M.**

On March 17, 2006, the parties engaged in a telephonic status conference before the Court. During the status conference, the Court re-opened discovery limited to the claims of T.M., the sole remaining plaintiff in this case.[10]

**a. T.M.'s Assault Allegations**

The following facts regarding T.M. are adopted, in relevant part, from the Court's previous opinion in this case. *See J.P.*, 2005 WL 2405993, at *4-5. At the time the Plaintiffs' filed their Second Amended Complaint, Plaintiff T.M. was an eighteen-year-old youth who had been in ODYS custody for approximately two years. *See id.* at *5. After a brief stay at the reception center in Scioto, Ohio, T.M. was permanently assigned to Marion Juvenile Correctional Facility ("MJCF") for the duration of his commitment. *See* Second Amended Complaint 11. While at MJCF, T.M. was placed in a number of different units, but he was housed in Building 5 for the majority of his confinement. *Id.*

---

**8.** This Court found the claims of Plaintiffs J.P., S.J., and D.B. to be moot, explaining, "[a]fter this case was filed, however, Defendants did in fact provide counsel to each of the three Plaintiffs named in the original Complaint (citations omitted). Thus, Defendants voluntarily ceased their allegedly unconstitutional actions, i.e., preventing meaningful access to the courts by denying Plaintiffs access to legal counsel." *See J.P.*, 2005 WL 2405993, at *12.

**9.** Defendants' First Motion for Summary Judgment asserted that the Court could not hear the named Plaintiffs' claims because they had failed to exhaust their administrative remedies before filing suit [Doc. No. 25]. The Court, finding the issue moot after dealing with the jurisdictional issues in Defendants' Second Motion for Summary Judgment, did not reach the merits of the exhaustion issue. *See J.P.*, 2005 WL 2405993, at *19:

**10.** Plaintiff H.H. voluntarily dismissed her claim without prejudice on July 7, 2005 [Doc. No. 87]. When the Court granted Defendants' Second Motion for Summary Judgment on September 29, 2005, all remaining named Plaintiffs were dismissed except M.M. and T.M., the two named Plaintiffs added when Plaintiffs filed their Second Amended Complaint [Doc. No. 106]. On September 12, 2005, however, Defendants filed their first supplemental memorandum in support of their *Third Motion for Summary Judgment* apprising the Court that M.M., through attorney Hicks, had filed a *pro se* excessive force claim in the Northern District of Ohio (case number 3:05-cv-07362). Therefore, M.M.'s claim was dismissed as moot, leaving T.M. as the only Plaintiff in this matter.

On October 14, 2004, T.M. and other inmates in Unit 5B, engaged in a small uprising, banging on their doors in order to get permission to use the bathroom. *See J.P.*, 2005 WL 2405993, at *5.[11] During the incident, a Juvenile Corrections Officer ("JCO") entered T.M.'s room and restrained him, "choking him out" until T.M. was rendered unconscious. *Id.* T.M. also sustained an eye injury when the JCO hit him in the eye. *Id.* Additionally, T.M. claims that after being assaulted, he received inadequate medical care for his injuries. *Id.*[12] When T.M. was released from the infirmary on October 15, 2004, he was transferred to Unit 2D in Building 2 and never returned to Building 5. *See* Defs.' Ex. A–1, Youth Injury & Assessment Form (10/15/2004); Defs.' Ex. A–3, Interdisciplinary Progress Notes (10/18/2004); Ex. A, Decl. of Jeffrey Rollins (5/4/2006); Ex. E, Aff. of Doneta Riegsecker (describing the movement for T.M. from the date of the incident to the date he was released from DYS).[13] Unlike youth in Building 5, youth in Unit 2D of Building 2 have a toilet and sink in their rooms; thus, they do not have to depend on ODYS staff to gain access to bathroom facilities. *See* Defs.' Ex. D, Aff. Norm Hills (6/1/2006).

On October 16, 2004, two days after the incident, T.M. filed an ODYS administrative grievance for assault in which he explained his injuries and indicated that he wanted the matter to be resolved "in court." *See J.P.*, 2005 WL 2405993, at *5. T.M.'s grievance included a written statement describing the assault by the JCO and asserting that youth were being forced to urinate in their rooms into rubber gloves rather than being allowed to use the bathroom. *Id.* T.M.'s grievance included no language asserting that he had been denied access to adequate medical care, and no specific allegations about unconstitutional conditions of confinement. *Id.*

The ODYS grievance committee subsequently found merit to T.M.'s complaint and indicated to him that "appropriate actions [would] be taken." *See* T.M. Dep., Pls.' Ex. B, at 2. The Superintendent

---

**11.** An investigative report regarding this incident revealed that Unit 5B guards "repeatedly den[ied] bathroom breaks as a form of discipline." *See* Defs.' Ex. B, Report of the Investigation of the 5B "Star" Housing Unit Incident, at 6. Further, the report stated that,

> [a]lthough it is believed that some youth may intermittently elect to urinate in milk cartons and latex gloves, it is acknowledged by virtually all interviewed staff and youth, that youth behavior determines whether or not youth are permitted restroom breaks. Staff would require youth to "remain quiet" for period of time until awarding restroom access.

*Id.*

**12.** At midnight on October 14, 2004, T.M. was seen at the infirmary complaining of difficulty breathing and problems with his throat. *See* Defs.' Supp. Memo at 2. A medical assessment was performed and treatment was rendered. *Id.* When T.M. felt better, the medical staff decided to monitor him through the night, and he was sent off-site for care. *Id.*

On October 14, 2004, at 3:00 p.m., T.M. was seen by medical staff in unit 2D. Defs.' Supp. Memo at 2. He stated that he was "okay" except for a sore throat, and staff observed that his left eye was stolen. He was sent to the infirmary where staff took photos of his left eye. *Id.* at 2–3. He was also given ice and Motrin for his eye and throat discomfort. *Id.* at 3.

Though the issue was not raised in any of the parties' prior papers, in Plaintiffs' Opposition Motion, they assert that T.M.'s denial of court access claim is also based upon his allegations of inadequate medical care, and his assertions of unconstitutional conditions of confinement. *See* Pls.' Opp. at 4, 11, 12, 13, 34, 35, 36, 38. T.M. claims to have filed written grievances about these claims; however, there is no evidence that any such grievances exist.

**13.** During oral argument, Defendants' counsel noted that, after the October 14, 2004 incident, *all* of the inmates from Unit 5B were transferred elsewhere.

agreed with the committee's finding. *Id.* Nonetheless, because T.M. was never apprised of any action taken in regards to his grievance, he appealed the Superintendent's decision to the Chief Inspector on December 15, 2004. Second Amended Complaint 11. On January 4, 2005, after having reviewed T.M.'s grievance, the Chief Inspector informed T.M. that he concurred with the committee's determinations and its decision to grant the grievance. *Id.* Further, the Chief Inspector informed T.M. that disciplinary action had been taken against the offending employees. *See* T.M. Dep., Pls.' Ex. B., at 2. Both Plaintiffs and Defendants are in agreement that T.M. exhausted a full round of the grievance process in pursuing his assault claim. *See* Pls.' Opp. at 16; Defs.' Third Motion for Summary Judgment at 9.

The record reveals that in the course of his stay at MCJF, T.M. filed a total of eight administrative grievances: (1) on October 15, 2004, T.M. claimed he was physically assaulted in Unit 5B;[14] (2) on October 16, 2004, T.M. claimed he was placed in Unit 2D without his personal hygiene items; (3) on October 16, 2004, T.M. objected to placement in Unit 2D and sought an explanation for the placement; (4) T.M. objected to placement and retention in Unit 2D; (5) on November 24, 2004, T.M. claimed he was locked in a restroom in Unit 2D; (6) on November 24, 2004, T.M. objected to participation in the GED program; (7) on November 24, 2004, T.M. claimed his positive behavior warranted his removal from Unit 2D; (8) on December 11, 2004, T.M. claimed showers in Unit 2D were cold and complained that worms were coming out of the drain. *See* Decl. Jeffrey L. Rollins, Human Services Program Administrator for MJCF at 1–2. None of these grievances relates to denial-of-access, and T.M. failed to attach his alleged recorded grievance to his complaint. T.M. asserts that his copies of each of the above grievances as well as any other "legal papers" that he had regarding his case were confiscated by ODYS guards, labeled "gang literature," and not returned to him upon his release. *See* Defs.' Ex. 5, T.M. Aff. 20.

### b. T.M.'s Pursuit of Legal Relief

As noted above, in filing his assault grievance on October 16, 2004, T.M. indicated that he wanted his assault charge to be resolved "in court." *See* Second Amended Complaint 11. Thus, in the latter part of October, 2004, T.M. sought representation through ODYS' Legal Assistance Program. *See id.* Pursuant to T.M.'s request, on November 1, 2004, T.M. met with contract attorney Mathews[15] who informed T.M. that he would find him an attorney to provide him with legal assistance. *Id.*

Initially, Mathews identified six attorneys who handled ODYS cases—Jillian Davis, John Lawson, David Doughten, Lisa Meeks, Mike Benza, and Benson Wolman—and sent a referral to those six individuals regarding T.M. *See* Pls.' Opp. at 6; *see* Mathews Dep. at 96.

Mathews re-visited T.M. on December 13, 2004, and provided him with a copy of a letter which stated in relevant part:

This letter is to update you on the status of the matter we previously discussed. After our conversation, I prepared a summary of the incident based upon what you told me and other information I had obtained from DYS. On November

---

14. As noted above, the parties do not dispute that T.M. fully exhausted his assault grievance.

15. *See supra* note 5 (noting that in revamping its legal services, ODYS hired contract attorney, Mathews, to provide legal assistance to inmates).

27, I sent letters to six attorneys asking them to review the information and consider representing you in this matter. So far, I have not received a response from any of them, but I plan to follow up with them the week of December 20th if I have not received a response.

When I hear from the attorneys I will let you know.

Defs.' Ex. D.

Shortly thereafter, Mathews, accompanied by Attorney Jillian Davis ("Davis"), met with T.M. to discuss his case. *See* Pls.' Ex. 2, Mathews Dep. at 32–35. Davis expressed an interest in taking T.M.'s case, and informed T.M. that she would look into the matter. *See* Defs.' Ex. 5, T.M. Aff. 8–10. Davis did not follow up with Mathews regarding T.M., and when Mathews spoke to her "a couple times" on the phone regarding her interest in taking on T.M. as a client, she told him that she was still contemplating it. Pls.' Ex. 2, Mathews Dep. at 34. Finally, on March

16, 2005, Davis informed Mathews by letter that she had just accepted a new position, and, as a result, would be unable to take on additional cases, including that of T.M. *See* Pls.' Ex. 4, Letter from Jillian Davis to Larry Mathews.

On March 29, 2005, after Mathews informed T.M. that Davis would not take his case, Hicks asserts that she sent T.M. a letter indicating that Cleveland attorney, Matthew Brownfield ("Brownfield") was willing to look over T.M.'s case. T.M. never responded, and he now claims that he never received the letter. *See* Pls.' Opp. at 22.

Though the details of what occurred regarding T.M.'s assault claim between December 2004 and March 2005 are in dispute,[16] both sides agree that during that time period, neither Mathews nor Hicks, was able to find an attorney willing to represent T.M. *See* Pls.' Opp. at 7–11; Defs.' Supp. Memo at 5–10.[17]

---

**16.** Defendants contend that despite their best efforts to make contact with him, T.M. continually refused to meet with Mathews and Hicks regarding his claims. Plaintiffs, however, argue that Mathews and Hicks never spoke directly with T.M., and that any testimony by others that T.M. had either refused meetings or opted not to pursue legal relief is inadmissible hearsay. *See* Pls.' Opp. at 12 ("Controverted Facts").

**17.** In Plaintiffs' Opposition, Plaintiffs write, "... T.M. was so in need of legal assistance while incarcerated at [MCJF] that his mother attempted to have her private attorney [Michael Rich] visit him at the facility." *See* Pls.' Opp. at 11. In his April 11, 2006 deposition testimony, T.M. also asserts that he was denied the right to seek legal assistance from a private attorney:

Q: Who was the attorney you tried to bring into this?

A: Mike Rich. That's my mom's private attorney.

Q: Okay. Did you write to him?

A: No, I didn't write to him, 'cause we was requesting him. My mom talked

to Mike Rich about it, and he said he'll come talk to me. My mom called up to the institution and talked to Norm Hills. Norm Hills said they got their own lawyers, and from that I never heard—I ain't heard from them yet.

*See* T.M. Dep. at 49.

In his affidavit, however, attorney, Michael Rich, asserts that he was *never* contacted by T.M.'s mother, and/or by T.M. himself. The affidavit states:

3. In 2003, I was appointed as counsel for [T.M.] by the Mahoning County Juvenile Court and represented him during his juvenile adjudication for burglary under Case No. 03 JA 544....

5. At no time was I ever contacted by any individual, including [T.M.] and his mother, Valerie Watkins, concerning an alleged assault of [T.M.] by a[JCO] while confined at the [MCJF]. Nor did I speak to Ms. Watkins and agree to talk to [T.M.] about the assault.

6. I have not represented or advised [T.M.] or his mother, Valerie Watkins, in any civil matter.

On June 1, 2005, ODYS released T.M. from institutional status and placed him under parole supervision. Defs.' Ex. B. Following T.M.'s release on parole, neither Mathews nor Hicks ever heard from T.M. by letter or telephone call. Defs.' Supp. Memo at 11. On January 11, 2006, the Mahoning County Court of Common Pleas, Juvenile Court Division, entered an Order terminating T.M. from parole. *Id.*

#### 4. Recent Occurrences

On April 11, 2006, following the Court's decision to re-open discovery as to T.M., the parties deposed T.M. Further, on April 19, 2006, the parties deposed DYS contract attorneys Mathews and Hicks.

Following the depositions, Hicks called T.M. and informed him that Cleveland attorney, David Doughten ("Doughten"), had agreed to represent him in filing a formal legal complaint for his assault charge. T.M. agreed to be represented, and, accordingly, Hicks referred T.M.'s case to Doughten, who subsequently filed suit on T.M.'s behalf in Federal District Court in Toledo, Ohio; the suit seeks damages for T.M.'s October 14, 2006 assault by a Unit 5B JCO (case number 3:06-cv-1127).

In late April, Defendants, citing new information gained in the depositions of T.M., Mathews, and Hicks, requested leave to file a third supplemental memorandum [18] in support of their Third Motion for Summary Judgment and brought a motion to alter or amend the Court's briefing schedule. The Court granted both of Defendants' requests. The issues are now fully briefed, and the Court conducted oral argument on June 8, 2006.

---

*See* Defs.' Ex. F, Aff. Michael Rich. Based on this conflicting testimony, and because T.M.'s assertion that his mom talked to Mike Rich is hearsay, the Court considers T.M.'s assertions that he was denied access to *private* counsel, as well as contract attorneys to be untenable.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court also must interpret all reasonable inferences in the non-movant's favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from mak-

---

18. Defendants had previously filed two supplemental memoranda in support of their Third Motion for Summary Judgment, the first on September 12, 2005 [Doc. No. 100], and the second on November 4, 2005 [Doc. No. 114].

ing credibility determinations or weighing the evidence). The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; however, there must be evidence from which the jury reasonably could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

## IV. ANALYSIS

In analyzing Defendants' Third Motion for Summary Judgment, the Court will first consider the jurisdictional issues of standing and mootness. If the Court finds both that T.M. has standing to bring his claims and that T.M.'s claims are not moot, then it may consider whether T.M. exhausted his administrative remedies before filing suit.

### A. Whether T.M. Lacks Standing

■ Article III, Section 2 of the United States Constitution confines the jurisdiction of federal courts to the resolution of actual "cases" and "controversies." *See Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); *NRA of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir.1997). The case or controversy limitation of Article III requires that a party invoking federal jurisdiction has standing—in other words, a "personal stake in the outcome" of the action. *See Baker v. Carr*, 369 U.S. 186, 294, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Stevenson v. J.C. Bradford & Co.*, 277 F.3d 838, 852–53 (6th Cir.2002). To establish a personal stake in the outcome of an action, a plaintiff must allege an "injury in fact" to his pre-existing, legally protected interest. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). That injury must be "(a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Id.; see also, TCG Detroit v. City of Dearborn*, 206 F.3d 618, 622 (6th Cir.2000). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560, n. 1, 112 S.Ct. 2130. Further, in cases in which a prisoner alleges he has been denied access to court, an inmate establishes standing by showing that he suffered an actual litigation related injury or legal prejudice because of the actions of the defendant. *See Lewis v. Casey*, 518 U.S. 343, 349–51, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (requiring "actual prejudice with respect to the contemplated or existing litigation, such as the inability to meet a filing deadline or present a claim").

In addition, the United States Court of Appeals for the Sixth Circuit has held that "standing does not have to be maintained throughout all stages of the litigation." *Cleveland Branch, NAACP v. City of Parma, Ohio*, 263 F.3d 513, 524 (6th Cir.2001). "Instead, [standing] is to be determined as of the time the complaint is filed." *Id.* The *Cleveland Branch* court exhaustively reviewed United States Supreme Court precedent to conclude that " 'jurisdiction is tested by the facts as they existed when the action [was] brought' and 'that after vesting, it cannot be ousted by subsequent events.' " *Id.* (quoting *Smith v. Sperling*, 354 U.S. 91, 93, n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957)). Consequently, the proper inquiry is whether a plaintiff was suffering or had suffered an actual injury *at the time a complaint was filed. Id.; see J.P.*, 2005 WL 2405993, at *9.

### 1. Standing for Denial–of–Access Claims

In *Christopher v. Harbury*, 536 U.S. 403, 412–13, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), the Supreme Court held that denial-of-access claims fall into two categories:

> [i]n the first, [*forward-looking* claims], are claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the *present* time ... In cases of this sort, the essence of the access claim is that official action is presently denying an opportunity to litigate for a class of potential plaintiffs. The opportunity has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed.

*See id.* at 413, 122 S.Ct. 2179 (emphasis added) (internal citations omitted). The second category, *backward-looking* claims, differs in that it:

> covers claims not in aid of a class of suits but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future. The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief ... These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of these sorts of access claims, then, is not the judgment of a further lawsuit, but simply the

judgment in the access claim itself, in providing relief obtainable in no other suit in the future.

*Id.* at 413–14, 122 S.Ct. 2179 (internal citations omitted). The Court also explained that no matter what the category, "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414–15, 122 S.Ct. 2179. Thus, the Court held that "we have been given no reason to treat backward-looking access claims any differently [from forward-looking claims]." *Id.* at 415, 122 S.Ct. 2179.

■ It follows that in drafting a complaint, a plaintiff must: (1) state the underlying non-frivolous cause of action, whether anticipated or lost; and (2) describe the "official acts frustrating the litigation" to show that he has suffered an actual injury. *Christopher,* 536 U.S. at 415, 122 S.Ct. 2179. In addition, plaintiffs bringing backward-looking claims must also "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial-of-access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.*

In joining Plaintiffs' purported class action as a name plaintiff, T.M. brought a forward-looking claim. T.M.'s forward-looking claim asserts that Defendants prevented him from filing a lawsuit on his assault claim by failing to provide him with the assistance of an attorney, and he is pursuing both declaratory and injunctive relief. He seeks a court order removing the alleged obstruction (denial of an attorney) so that he may pursue, in a separate action, his underlying substantive assault claim. In Plaintiffs' Opposition Motion,

however, T.M. expanded his lawsuit by introducing a new backward-looking claim. T.M. now asserts that in addition to failing to provide him with access to an attorney to bring his assault claim, Defendants' actions also prevented him from filing claims for relief from inadequate medical treatment and unconstitutional conditions of confinement. *See* Pl.'s Opp. at 3, 4. Though typically, the Court will not consider new claims introduced in the pleadings without leave of court, because Defendants responded to Plaintiffs' assertions in their Reply Memorandum, the matters have been briefed for the Court's review. Therefore, in discussing standing, the Court will consider both T.M.'s forward and backward-looking claims.

### 2. Standing as to T.M.'s Forward–Looking and Backward–Looking Claims

Applying the line of reasoning from *Christopher* to T.M.'s claims, this Court must decide whether T.M. has standing when he was added to the lawsuit by considering: (1) whether T.M.'s initial claim was nonfrivolous; and (2) whether T.M. was actually injured when Defendants allegedly denied him access to an attorney. *See* 536 U.S. at 413, 122 S.Ct. 2179. Further, in considering T.M.'s backward-looking claim, the Court must consider whether T.M. has identified a possible remedy that may be awarded that would not otherwise be available in some suit that may yet be brought. *See id.* at 415, 122 S.Ct. 2179.

### a. T.M.'s Initial Suit: the Forward–Looking Claim

█ In T.M.'s initial suit, a forward-looking claim, he alleges that he was denied access to the courts, and was, therefore, prevented from bringing his assault claim. Defendants' Supplemental Memorandum to their Third Motion for Summary Judgment, Defendants argue that T.M. lacks standing to bring his claim that

he was denied court access in pursuing his assault claim because he has failed to show that he suffered an actual injury at the hands of Defendants. *See* Defs.' Supplemental Memo at 14. Defendants contend that, "the only barrier to [T.M.] not bringing suit or not bringing suit on [his] underlying claims is [his] own decision, together with [his] attorneys, not to avail [him]self of the opportunity to do so." *Id.* Plaintiffs counter that T.M. suffered from denial of court access at the time he was added to the Second Amended Complaint, and that he continued to suffer until he was released on parole in June 2005. *See* Pl.'s Opp. at 17–19. Plaintiffs also contend that T.M. did not divest himself of standing by filing suit in federal court or by allegedly "refusing" to consult with available attorneys through Matthews and Hicks. *Id.*

### I. Whether T.M.'s Underlying Claim was Nonfrivolous

The underlying claim on which T.M. bases his forward-looking denial-of-access claim is that while he was housed at MCJF Unit 5B, he was physically assaulted by a JCO resulting in multiple injuries. *See supra* Part II.B.3.a. The Sixth Circuit has held that spontaneous unprovoked assaults by prison guards support a prisoner claim under 42 U.S.C. § 1983. *Pelfrey v. Chambers,* 43 F.3d 1034 (6th Cir.1994); *see also, DeCosta v. Medina County,* 2006 WL 1473256, at *5 (N.D.Ohio May 22, 2006).

It is undisputed that T.M. pursued his "assault" claim through the ODYS administrative process, and that the grievance committee found it legitimate. *See* Second Amended Complaint 11. Therefore, the Court finds that T.M. has asserted a nonfrivolous claim that he was assaulted in violation of the Eighth Amendment of the United States Constitution, which prohibits cruel and unusual punishments as well as the use of excessive physical force

against prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct: 1970, 128 L.Ed.2d 811 (1994) ("In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners.").

### ii. Whether T.M. Suffered an Actual Injury

To state a claim for denial-of-access to the courts, a prisoner must demonstrate actual prejudice to pending or contemplated litigation. *See Lewis*, 518 U.S. at 351, 116 S.Ct. 2174. Under the mandate of *Bounds v. Smith*, "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Instead, an inmate "must go one step further and demonstrate that the alleged shortcomings in the ... legal assistance program hindered his efforts to pursue a legal claim." *Id.* at 351, 116 S.Ct. 2174. Thus, examples of actual prejudice include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline. *See id.; Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir.1985).

In this case, T.M. claims that he was denied access to the courts because Defendants failed to afford him an attorney to assist him in filing a legal complaint regarding his assault charge. In his deposition testimony, he stated:

> I have not been given any information about the investigation by DYS into the attack on me. I would have used an attorney to help me get information about the investigation. I wanted an attorney so I could learn about my rights regarding what had happened to me including any possible damages I could receive. I wanted an attorney to help publicize how Marion is run and what happened to me. Because I have not had an attorney, I have been angry and upset and frustrated.

*See* Defs.' Ex. 5, T.M. Aff. 12–13.

As of the date T.M. was added to the Second Amended Complaint, he had specifically requested legal counsel to assist him in his efforts to pursue legal relief for his assault claim. *See* Second Amended Complaint 11. Nonetheless, as of that time, it is undisputed that neither Matthews nor Hicks had retained counsel for him. Further, a question of material fact exists as to whether, after his initial meetings with Matthews, T.M. refused to meet with both Matthews and Hicks during their subsequent visits to MCJF. Because all inferences must be resolved in favor of the non-moving party in a motion for summary judgment, the Court cannot accept as true Defendants' bare assertion that T.M.'s alleged refusal to meet with Mathews and Hicks signaled his abandonment of his previous request for counsel. *See Adickes*, 398 U.S. at 157, 90 S.Ct. 1598. Thus, the Court finds that because at the time he was added to Plaintiffs' suit, T.M.'s lack of legal counsel had prevented him from filing a complaint regarding his assault, he had suffered an actual injury by being denied meaningful access to the courts. Accordingly, T.M. has standing to bring his forward-looking claim.

### b. T.M.'s Backward–Looking Claim

#### I. Whether T.M.'s Underlying Claims are Nonfrivolous

T.M. bases his backward-looking claim on the following assertions: (1) that he was denied adequate medical treatment; and (2) that he suffered from unconstitutional conditions of confinement. *See* Pls.' Opp. at 3, 4.

### a) Inadequate Medical Treatment

■ To establish a constitutional claim of inadequate medical care, a plaintiff must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standard of deliberate indifference includes both objective and subjective components. *Id.* First, the deprivation of care must objectively be "sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). Second, the facts must give rise to a reasonable inference that the individuals responsible for providing medical care knew of those serious medical needs and intentionally disregarded them. *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Moreover, courts have held that inadequate medical care claims must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness ... nevertheless, mere negligence or malpractice does not violate" the tenets of the Constitution. *Estelle,* 429 U.S. at 107, 97 S.Ct. 285; *see also, Miltier v. Beorn,* 896 F.2d 848 (4th Cir.1990).

In T.M.'s deposition testimony, he relayed the following facts about the medical care with which ODYS provided him after the October 14 assault. These facts serve as the background to his claim that he was provided with inadequate medical care.

Q: Okay, now Mr. M., do you remember if a nurse came or anybody, or did they take you—to did a nurse come there, any health care people come to the scene, or did they take you to the infirmary? What did they do?

A: They carried me out to my room, laid me in the hallway, and a nurse came and—....

A: And she put some type of heart monitor thing on my finger, and that was it. Gave me some water, checked my heart rate. I believe that was it. She gave me an inhaler that, you know what I'm saying, wasn't mine. I ain't got asthma. She gave me an asthma inhaler that wasn't even mine, so I don't know where that came from....

Q: Were you taken to the infirmary, do you recall.

A: No I was [taken] to Building 2....

Q: Following this incident ... were you also—did you or did you not go to the infirmary?

A: No.

Q: Okay. Following this incident on October 13, did you ever go to the infirmary to seek medical attention?

A: Not for that specific reason, not for that....

A: We probably got that mixed up. I wanted medical attention for that situation. They never gave it to me, you know what I mean, so I never got medical attention for that situation that happened.

Q: Did you go to the infirm—

A: I let them know I wanted medical attention.

Q: How did you let them know?

A: I told them I wanted to see the doctor, I wanted to see the nurse.

Q: And what happened?

A: They put me in Building 2....

Q: After October 14, did you go to the infirmary for other reasons besides what happened there on October 14, 2004? Did you go for other reasons to the infirmary?

A: After that I went, because I had stiffness in my neck, and my eye was swollen.

Q: Okay. Please listen to my question. After October 14, 2004, did you ever go to the infirmary? I don't care for what

purpose, just did you ever go to the infirmary?

A: Yeah, I went.

Q: For what purpose?

A: For stiffness in my neck, and my eye was swollen....

*See* T.M. Dep. at 24–26. Aside from T.M.'s testimony, however, Plaintiffs have presented no further evidence that T.M. was denied access to adequate medical care.

The court in *Pruitt v. Moore* was confronted with a factual scenario similar to that in the instant case. *See* 2003 WL 23851094 (D.S.C. July 7, 2003). In *Pruitt*, prisoner plaintiff brought a *pro se* action pursuant to 42 U.S.C. § 1983, claiming that defendants, prison administrators, violated his constitutional rights by failing to provide him with adequate medical care, humane living conditions, and access to the courts. *Id.* at *1. In bringing his claims regarding access to adequate medical care, Plaintiff alleged the following: (1) the medical center was overcrowded; (2) his dorm often had no Tylenol or Aspirin available; (3) he was given the wrong medication on one occasion; (4) he nearly overdosed on medication when he was being treated for kidney stones; (5) one of his veins collapsed after he received medications intravenously; (6) medical personnel were disrespectful; and (7) after a nurse administered a TB test, he had a positive reaction to the test, though a previous test had been negative. *Id.* at *6. The court concluded that despite plaintiff's multitude of claims, he had failed to show that, "[d]efendants were deliberately indifferent to any of his serious medical needs." *Id.* at *7. The court explained,

[p]laintiff appears to disagree with the type and amount of medical treatment he received. Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice. The provision of medical care by prison officials is not discretionary, but the type and amount of medical care is discretionary. A disagreement as to the proper treatment to be received does not in and of itself state a constitutional violation.... Additionally, incorrect medical treatment, such as incorrect diagnosis is not actionable under 42 U.S.C. § 1983.

*See id.,* at *7–8 (internal citations omitted).

In this case, as in *Pruitt*, T.M. does not dispute that he received *some* medical care. He merely claims that the care he was given was "inadequate." Further, based on the record, it appears that after undergoing treatment at the infirmary in October 2004, T.M. did *not* voluntarily return for follow-up treatment. Because he has provided no evidence that Defendants were "deliberately indifferent" to his needs, or that Defendants withheld from him necessary life-saving treatment, his assertions fail to establish the question of material fact necessary to keep his claim alive in the face of Defendants' Third Motion for Summary Judgment. Because the Court determines T.M.'s underlying "inadequate medical care" claim to be frivolous, he does not have standing to pursue his backward-looking denial-of-access claim based on his assertions that Defendants' actions denied him the right to pursue an inadequate medical care claim while housed at ODYS.

#### b) Unconstitutional Conditions of Confinement

■ The Eighth Amendment's ban on cruel and unusual punishment applies to a prisoner's conditions of confinement that are not formally imposed as a sentence for a crime. *Helling v. McKinney,* 509 U.S. 25, 29–30, 113 S.Ct. 2475, 125 L.Ed.2d 22

(1993). To sustain an Eighth Amendment conditions of confinement claim, an inmate must establish two elements: (1) the objective elements requires that the conditions of confinement were inadequate, and (2) the subjective element requires that the defendants have a culpable state of mind, which is measured by a "deliberate indifference" standard. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

As to the first element, conditions of confinement may constitute cruel and unusual punishment if they result "in unquestioned and serious deprivations of basic human needs ... [which] deprive inmates of the minimal measures of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). "No static 'test' can exist by which courts can determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from evolving standards of decency that mark the progress of a maturing society." *Id.* at 346, 101 S.Ct. 2392. The Eighth Amendment does not mandate comfortable prison conditions, and prisons that house inmates convicted of serious crimes cannot be free of discomfort. *Peterkin v. Jeffes,* 855 F.2d 1021, 1027 (3d Cir.1988). As the Supreme Court has stated, "extreme deprivations are required to make out a conditions-of-confinement claim ... [b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.' " *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392). As to the second element—the "deliberate indifference" requirement, a prison official's conduct does not violate a prisoner's constitutional rights "unless the official knows of and disregards an excessive risk to inmate health or safety ... [The] official must be both aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

T.M. claims that he was subjected to unconstitutional conditions of confinement while under ODYS care. Though T.M. is not specific as to the facts underlying his claim, three of his recorded administrative grievances relate to unconstitutional conditions of confinement: (1) on October 16, 2004, T.M. claimed that he was moved to Unit 2D without his personal hygiene items; (2) on November 24, 2004, T.M. claimed that he had been locked in a restroom in Unit 2D; and (3) on December 11, 2004, T.M. claimed that showers in Unit 2D were cold and complained that worms were coming out of the drain. *See* Decl. Jeffrey L. Rollins, Human Services Program Administrator for MJCF at 1–2. Moreover, an internal investigation of Unit 5B, where T.M. was housed during the October 14, 2004 incident, revealed a culture in which youth were "repeatedly den[ied] bathroom breaks as a form of discipline." *See supra* note 11. Thus, the Court will consider the above allegations in determining whether T.M. has a nonfrivolous unconstitutional-conditions-of-confinement claim.

In *Johnson v. J.W. Fairman,* an inmate brought a *pro se* suit against prison administrators under 42 U.S.C. §§ 1983 and 1997, alleging that he suffered from unconstitutional conditions of confinement and was denied adequate medical care while being housed as a pre-trial detainee. *See* 1997 WL 137179, at *1 (N.D.Ill. Mar. 24, 1997). Among other things, plaintiff alleged that during his stay, "he had to endure cold, dirty showers, a non-functioning sink, and unsanitary conditions." *Id.* Further, plaintiff asserted that he had sent countless unanswered complaints as to his

"improper treatment" to prison administrators with no response. *Id.* The court held that because plaintiff's allegations failed to establish that any of defendants *intentionally* or *recklessly* caused the allegedly unconstitutional conditions to exist, plaintiff had failed to state a claim on which relief can be granted. *Id.* at *3–4 (emphasis added). The court explained that,

> [g]enerally, only "genuine privations and hardship over an extended period of time might ... amount [ ] to punishment," [t]hus minor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim. Courts of this circuit have consistently held that jails do not have to provide a detainee with the amenities accorded to a hotel guest.

*Id.* at *2–3.

In this case, like the *Johnson* plaintiff, T.M. has failed to present facts establishing that any of the Defendants intentionally or recklessly caused unconstitutional conditions to exist, i.e. allowed him to be locked in a bathroom, or forced him to endure cold showers, accompanied by worms. *See Lopez v. Robinson,* 914 F.2d 486, 492 (4th Cir.1990) (finding that there is no clearly established right to a "hot shower" in prison).

As to T.M.'s allegations that he was deprived of his personal hygiene items when he was moved to Unit 2D, the Court notes that many courts have considered some person hygiene items such as toothpaste, soap and toilet paper to be "minimal necessities of civilized life." *See, e.g. Carver v. Bunch,* 946 F.2d 451, 452 (6th Cir. 1991) (finding that some personal hygiene items such as toothpaste, soap and toilet paper may be considered "minimal necessities of civilized life"); *see also, Chandler v. Baird,* 926 F.2d 1057, 1065 (11th Cir.1991)

(same); *but see, Difilippo v. Vaughn,* 1996 WL 355336, *5 (E.D.Pa. June 24, 1996) (finding that the deprivation of a wash cloth and the denial of a change of undergarments for twenty days do not constitute cruel and unusual punishment because they do not amount to a deprivation of the "minimal necessities of civilized life"). In T.M.'s grievance regarding his denial-of-access to his personal hygiene items, he wrote, "I was sent back to [G.P.] without my personal stuff that I had when I came over here 2–C ... went to see if it was there in ... the room." *See* Defs.' Ex. A–1, Youth Grievance Form. He requested that his material be replaced. In response, guards searched for the property, and, upon finding nothing, the grievance committee recommended that ODYS, where possible, ODYS should replace T.M.'s property. *Id.* Thus, though some courts have held that the deprivation of personal hygiene items *can* amount to a constitutional violation, in this case, because T.M. has not shown either that the deprivation was intentional or reckless, or that the deprivation seriously harmed him in any way, the Court finds that it does not amount to an unconstitutional conditions of confinement claim.

▮ Nonetheless, the Court finds that the Unit 5B guards' custom of regularly depriving inmates of restroom access amounts to a potential constitutional violation. *See supra* note 11 (internal investigation finding that guards in Unit 5B regularly deprived inmates of restroom access as a means of discipline). In *Graham v. Fries,* plaintiff inmate sued defendants, prison officials, claiming, among other things, that his denial of use of the toilet for several hours amounted to the wanton infliction of pain; at trial, the jury found for plaintiff. *See* 1996 WL 1057212, at *8 (E.D.N.Y. Oct.16, 1996). The court subsequently denied defendants' post-trial mo-

tion for judgment as a matter of law, holding that:

> a jury properly could have found, given the testimony and reasonable inferences that may be drawn therefrom, that denying Graham the use of a toilet for several hours was a wanton and unnecessary infliction of pain. *See Lamb v. Cade,* 51 F.3d 277 (8th Cir.1995) (holding that denying pre-trial detainee opportunity to use the adequate toilet facilities violated 42 U.S.C. § 1983). While Graham did not testify that he experienced pain from these conditions, he testified that after several requests to use a toilet were ignored, he "couldn't hold it no more" and urinated on the floor ... Viewing the evidence in the light most favorable to Graham, the jury could have drawn the reasonable inference that Graham suffered from the wanton infliction of unnecessary pain and that access to a toilet at least once ever few hours is one of the "minimal civilized measures of life's necessities." Finally, the jury could reasonably have found that these corrections personnel were deliberately indifferent to Graham's pain in light of his numerous requests to use the bathroom.

*Id.* Because ODYS has conducted an internal investigation confirming that Building 5 inmates are often deprived of bathroom access as a disciplinary measure, and, therefore, forced to urinate in other recepticals, i.e. latex gloves, the Court finds T.M.'s assertions that he suffered from unconstitutional conditions of confinement while being housed at ODYS amount to a nonfrivolous claim.

## ii. Whether T.M. Suffered an Actual Injury

■ In bringing his backward-looking claim, T.M. must also show that he suffered an actual injury by being denied court access to bring his nonfrivolous unconstitutional conditions of confinement claim. In essence, T.M. must show that by being denied access to a lawyer, his ability to bring a legal claim asserting that he was being housed under unconstitutional conditions was lost.

In his affidavit, T.M. states that he could have "used an attorney to help [him] get information about the investigation" of his assault claim. *See* Defs.' Ex. 5, T.M. Aff. 12–13 Further, he asserts that he wanted an attorney "so [he] could learn about [his] rights regarding what had happened to [him]." *See id.* Defendants counter, however, that T.M. never evidenced an intent to pursue an unconstitutional conditions of confinement claim to Mathews. *See* Dep. Mathews. The Court notes, however, that in January, during Attorney Davis' initial meeting with T.M., Mathews left the room after introducing them. *See* Dep. Mathews, at 73, lines 1–3. Thus, Mathews cannot be sure of what Davis and T.M. discussed in regards to his case.[19] At that point in time, T.M. thought Davis was taking his case,[20] and, accordingly, a question remains as to whether during their conversation, he mentioned his desire to bring an unconstitutional conditions of confinement claim against ODYS. Hence, viewing the facts in the light most favorable to Plaintiffs, T.M. has established a question of material fact as to whether his denial-of-access to an attorney to assist him in bringing his unconstitutional conditions of confinement claim caused him an

19. There is no testimony on the record regarding the conversation occurring between T.M. and Attorney Davis in January.

20. T.M. was not informed until mid-March 2005 that Davis would not represent him, and he maintains that, until that time, he thought Davis had taken his case.

actual injury, sufficient to survive Defendants' Third Motion for Summary Judgment.

### iii. Whether T.M. has Identified a Unique Remedy

■ Though T.M. has pled facts showing both that he has a nonfrivolous underlying unconstitutional conditions of confinement claim, and that Defendants' actions caused him actual injury, his standing to bring his backward-looking denial-of-access claim fails in that he has *not* shown that he can obtain a remedy in pursuing his backward-looking claim that he could not receive in any other litigation.

As T.M. has been released from ODYS custody, he cannot be awarded injunctive relief to remedy any alleged unconstitutional conditions of confinement. Because he cannot establish that there is a reasonable likelihood that the allegedly wrongful acts will recur as to him, any such injunction would be moot as to T.M.[21] Thus, all that remains to compensate T.M. for his backward-looking denial-of-access claim is money damages. Should he choose, T.M. could pursue money damages for his claim in federal district court. In fact, it is undisputed that he is already pursuing such relief for his assault claim. As the Supreme Court noted in *Christopher*, there is "no point spending time and money to establish the facts constituting denial-of-access" when T.M. would end up just as well after litigating a simpler case without the denial-of-access element in federal court. *See* 536 U.S. at 414–15, 122 S.Ct. 2179. Because the Court finds that T.M. has no standing to bring his backward-looking denial-of-access claim, the remainder of this Court's Opinion pertains only to T.M.'s forward-looking claim requesting declaratory and injunctive relief based on his assertion that ODYS denied him access to an attorney to assist him in pursuing his assault claim.

### B. Mootness

Finding that T.M. has standing to pursue his claim, this Court must now consider Defendants' argument that circumstances occurring since the filing of the Second Amended Complaint have rendered T.M.'s claim moot. As the Court discussed *supra*, the United States Constitution limits the jurisdiction of federal courts to matters that present actual "cases" or "controversies." *See* U.S. Const. art. III, § 2, cl. 1. A case becomes moot "when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome." *See Cleveland Branch, NAACP*, 263 F.3d at 530 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). In essence, the mootness doctrine posits that cases, which, due to changed circumstances, can no longer impact the interests of the litigants, may not be adjudicated in the federal courts. *See DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (plaintiff's case challenging the constitutionality of a state law school's admissions process was found moot; plaintiff was nearing completion of his final year in law school when the case reached the United States Supreme Court for review, and the Court found that its decision would no longer affect his interests).[22]

---

**21.** It is notable that after the October 14, 2004 incident, T.M. was moved from Unit 5B to Unit 2D, where inmates have access to their own toilets. In moving him, ODYS voluntarily ceased their allegedly unconstitutional actions as to T.M., arguably mooting the need for T.M. to pursue injunctive relief. As discussed *supra*, at oral argument, Defendants' counsel also asserted that ODYS relocated *every* Unit 5B inmate after the incident.

**22.** The Supreme Court has repeatedly described mootness as, "the doctrine of

Defendants assert that T.M.'s denial of court access claim is moot because: (1) as of April 2006 when Doughten filed suit on T.M.'s behalf, ODYS had provided T.M. with the relief he seeks; (2) as of January 2006, T.M. was discharged from parole, terminating the juvenile Court's jurisdiction for his commitment; and (3) now that T.M. is an adult, should he commit a felony, he will be confined to the adult system, and, therefore, is no longer under the control of ODYS. *See* Defs.' Supplemental Memorandum at 16–18. Plaintiffs counter that T.M.'s claims fall under both of the two major exceptions to the mootness doctrines—(1) the "capable of repetition yet evading review" doctrine, and (2) the "voluntary cessation" doctrine.

### 1. Capable of Repetition Yet Evading Review

■ The Supreme Court recognizes an exception to mootness in cases that are "capable of repetition, yet evading review." *See Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982). The Court has explained that, "in the absence of a class action, the 'capable of repetition, yet evading review' doctrine [is] limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the *same complaining party* would be subjected to the *same action* again." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (emphasis added); *see also, Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (class action challenging a state's durational residency requirement for dissolution of a marriage was not rendered moot by the fact that the class representative subsequently fulfilled the residency requirement; state officials would undoubtedly continue to enforce the requirement against other class members and yet, because of the passage of time, no single challenger would remain subject to its restrictions for the period necessary to see a lawsuit to its conclusion).

It is undisputed that T.M., who is currently nineteen years old,[23] is no longer a minor. Further, it is undisputed that T.M. was discharged from parole on January 11, 2006, releasing him from the control of ODYS. *See* Defs.' Supplemental Memorandum at 17; Ohio Rev.Code § 5139.10 (the control by the department of youth services of a child committed as a delinquent shall cease when the child is either discharged from probation and/or reaches twenty-one years of age).

Defendants assert that the capable of repetition yet evading review exception does not apply to T.M. because his commitment has been formally terminated. There is substantial precedent establishing that a prisoner's claims for declaratory or injunctive relief are mooted when that prisoner is no longer incarcerated. *See, e.g. City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 493–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir.1996) (a prisoner's claims for injunctive relief become moot when that

standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Servs.*, 528 U.S. 167, 212, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

**23.** T.M. was born on September 16, 1986, and he will be twenty years old on September 16, 2006. *See* T.M.'s Dep. at 6, line 65.

prisoner is no longer incarcerated); *Mezo v. Taylor*, 1993 WL 524220, at *1, 1993 U.S.App. LEXIS 32954, at *2–3 (6th Cir. Dec. 15, 1993) ("Mezo is no longer incarcerated at DCDC, and there has been no showing of a reasonable expectation that he will again be a prisoner in that facility. His claims for declaratory and injunctive relief are therefore moot."). Plaintiffs counter that though T.M. has been released from parole and is no longer a juvenile, because Ohio's juvenile courts retain jurisdiction over offenses committed while the accused was under the age of 18, it is possible that T.M. will return to ODYS custody. *See* Pls.' Opp. at 30.

In *Murphy v. Hunt*, Hunt, a plaintiff-prisoner, filed a civil rights complaint seeking declaratory and injunctive relief with respect to the denial of his bail under a provision of the Nebraska Constitution prohibiting bail in cases involving violent sexual offenses. *See* 455 U.S. at 478, 102 S.Ct. 1181. The district court dismissed Hunt's case, but, on appeal, the Eighth Circuit reversed the earlier dismissal, explaining that because the Nebraska Supreme Court *might* overturn each of Hunt's three convictions, and because Hunt might then once again demand bail before trial, "the matter fell within th[e] class of cases 'capable of repetition, yet evading review.'" 455 U.S. at 478, 102 S.Ct. 1181. Nonetheless, the Supreme Court disagreed, and found the mootness exception inapplicable because, though a mere possibility existed that Hunt's convictions might be overturned and that he could, once again, seek pretrial bail, Hunt had not presented factual evidence showing that it was *reasonable* to suspect that all three of his convictions would be overturned on appeal. *Id.* The Court explained,

> [t]he Court has never held that a mere physical or theoretical possibility [i]s sufficient to satisfy the test stated in *Weinstein.* If this were true, virtually any matter of short duration would be reviewable. Rather, we have said that there must be a "reasonable expectation" or a "demonstrated probability" that the same controversy will recur involving the same complaining party. We detect no such level of probability in this case. All we know from the record is that Hunt has been convicted on three separate offenses and that his counsel was willing to stipulate that, for the purposes of Hunt's eligibility for bail, the proof of guilt was evident and the presumption great. Based on these two facts, we cannot say that there exists a "reasonable expectation" or "demonstrated probability" that Hunt will ever again be in this position. There is no reason to expect that all three of Hunt's convictions will be overturned on appeal. Hunt's willingness to stipulate that the proof against him was "evident" does not encourage us to believe otherwise.

*See id.* at 483, 102 S.Ct. 1181 (internal citations omitted).

In the instant case, Plaintiffs assert that the capable of repetition yet evading review doctrine applies to T.M. because, though he was discharged from parole, "it is still possible for the state to prosecute T.M. for offenses committed while he was a minor." *See* Pls.' Opp. at 30. Plaintiffs, however, have presented no evidence that T.M. committed any other offenses while he was under 18. In fact, they note that, "T.M. does not admit or concede that any such offenses took place, but merely makes the point that Ohio's state laws permit the government to initiate prosecutions in juvenile court against individuals who are no longer juveniles." *See id.* at 30, n. 15. Just as the claims by Hunt that the capable of repetition yet evading review exception applied based on a remote possibility that all three of his previous

convictions would be overturned, here, Plaintiffs may not rest on their vague assertions that T.M. might get haled back into juvenile court for an unspecified previous offense. Such claims do not amount to evidence that there was a *reasonable expectation* that T.M. might, once again, be denied access to the courts by ODYS. Thus, the capable of repetition yet evading review exception to the mootness doctrine is inapplicable to T.M.

### 2. Voluntary Cessation Doctrine

 As noted *supra*, in *John L.*, the Sixth Circuit discussed the scope of the right of access to the courts for juvenile prisoners. *See John L.*, 969 F.2d at 233. *John L.* established that in order to provide juvenile prisoners with *meaningful* court access, states must develop programs that allow them to consult with attorneys in pursuing potential federal claims. *Id.* at 237. Applying the tenets of *John L.*, since on or about October 2004, ODYS asserts that it has undertaken wholesale reform of its legal assistance program. Thus, Defendants now argue that ODYS' voluntary cessation of its allegedly unconstitutional actions moots T.M.'s claim.

The Court is aware that with respect to several of the allegedly unconstitutional aspects of the ODYS legal assistance program, Defendants have instituted changes in anticipation of trial, have allegedly attempted improvements, and have presented evidence of planned future changes or improvements. *See supra* note 5. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). As a general proposition, the "voluntary cessation of allegedly

illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot … The defendant is free to return to his old ways." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (footnote omitted). Thus, although Defendants' efforts to ameliorate or to correct in anticipation of trial various alleged deficiencies at ODYS are commendable, they do not deprive this Court of the power to order injunctive and/or declaratory relief, where otherwise proper, unless: "(1) it can be said with assurance that 'there is no reasonable expectation' that the alleged violation[s] will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *See County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. 894). Defendants bear a "heavy burden" of showing that both of the above conditions have been satisfied in order to render moot any allegedly deficient condition. *County of Los Angeles*, 440 U.S. at 631, 99 S.Ct. 1379. The rule is meant to protect a party from an opponent who seeks to defeat judicial review by temporarily altering its behavior. *See City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001) (citations omitted).

There is, however, a "difference in the way voluntary cessation of illegal activities is treated when the offending parties are government officials rather than private parties." *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir.1990). "Cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties. *See id.* According to one commentator, such self-correction provides a secure foundation for a dismissal based

on mootness so long as it appears genuine." *Id.* (citing 13A WRIGHT, MILLER & COOPER FED. PRAC. & PRO. § 3533.7, at 353 (2d ed.1984)). Moreover, the Supreme Court has explained that in the context of prisons, courts "encourage local experimentation' in various methods of assuring access to the courts," noting that courts should "leave it to prison officials to determine how best to ensure" such access. *Lewis,* 518 U.S. at 352, 356, 116 S.Ct. 2174 (suggesting as an example in adult prisons the replacing of law libraries with "minimal access to legal advice and a system of court-provided forms") (citations omitted).

This Court previously discussed the voluntary cessation doctrine in its September 29th Opinion. *See J.P.,* 2005 WL 2405993, at *12–17. After considering three factors—(1) the likelihood of recurrence, (2) the attempted interim relief, and (3) redressability—this Court held that the voluntary cessation doctrine mooted J.P., S.J. and D.B.'s claims. *Id.* This Court found that Defendants met their burden of showing that there was no reasonable expectation that the denial-of-access to the courts would reoccur with regard to named plaintiffs J.P. and S.J., explaining that after both inmates had been released from the ODYS correctional facility, the Court could "not assume" that they would be incarcerated again in the future. *See id.,* at *13. Further, though plaintiff D.B. remained incarcerated, this Court held that because "Defendants [had] made significant changes to their legal assistance policy that will affect all juveniles incarcerated in facilities operated by ODYS," and because "Plaintiffs offer[ed] no evidence ... that would tend to show that the changes made to the legal assistance program are in any

manner deficient," Defendants met their burden of showing that their prior allegedly unconstitutional conduct was unlikely to recur against D.B. or the other named plaintiffs. *Id.* Now, months later, the Court must again consider whether ODYS' failure to provide incarcerated youth with access to the courts is likely to recur, and whether the interim relief provided by ODYS eradicated the effects of its failure to provide incarcerated youth with access to the courts.

In April 2006, T.M. was provided with an attorney, Doughten, and his assault claim is currently pending in federal court. Therefore, as demonstrated in this Court's capable of exception yet evading review analysis, it is unlikely that ODYS' failure to provide T.M. with access to the court system will recur. Nonetheless, the Court revisits its previous conclusion that in making interim changes, "Defendants have met their burden of establishing that their actions 'made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *See J.P.,* 2005 WL 2405993, at *16.

At first glance, it appears that Plaintiffs have presented evidence undercutting this Court's previous holding that ODYS' allegedly unconstitutional actions have been eradicated by the changes to its legal assistance program.[24] Though ODYS hired contract attorneys, Mathews, and later, Hicks, to meet with and aid prisoners in determining whether their potential complaints had merit, neither Mathews nor Hicks has *ever* personally represented anyone other than one of the named plaintiffs in court. Mathews Dep. at 17–19. Further, Mathews has not represented any

24. Due to this Court's stay on discovery regarding the new ODYS program, Plaintiffs have been unable to conduct significant discovery regarding the extent of ODYS' reforms. Plaintiffs allege, however, that despite ODYS' remediation attempts, juvenile prisoners continue to be denied their constitutional rights to court access, and they ask that the Court consider re-opening discovery so they can look more closely at these issues.

youth in filing *pro se* complaints, and Hicks has represented only M.M. Mathews Dep. at 17–19; Hicks Dep. at 65. This Court finds it suspect that beyond the named plaintiffs, there is *no single* other youth desiring to take nonfrivolous legal action against the system among the approximately 1,800 ODYS youth; hence, it appears that Defendants' remediation efforts, while assisting named plaintiffs, have not gotten to the heart of the problem.

Second, although the minute details of Mathews' efforts to retain counsel for T.M. between March 2005 and April 2006, are in dispute, the parties agree that it was over one full year before T.M. was referred to Doughten and able to file a formal legal complaint regarding the October 14, 2004 assault. *See* Kinsley Aff., 5–8. Defendants repeatedly argue that Mathews and Hicks tried to contact T.M. both by mail and by phone, but such arguments are speculative especially in the face of T.M.'s assertions that he at no point relinquished his assault claim. Under the terms of Mathews' contract with ODYS, if he cannot retain an outside attorney for a potential plaintiff, he must aid them in filing a *pro se* complaint. Thus, where T.M. desired to pursue what has been adjudged a nonfrivolous claim, it is unclear why Mathews continued to consult outside counsel without ever offering T.M. the option of bringing a *pro se* lawsuit.

Finally, despite the fact that when Mathews was initially hired as the ODYS contract attorney he traveled "to each [ODYS] institution on a bi-weekly basis to talk to the inmates about issues related to the conditions of their confinement," Plaintiffs assert that Hicks, Mathews' replacement, does *not* conduct these routine visits at certain facilities. *See J.P.*, 2005 WL 2405993, at *14. Hicks' failure to visit potential plaintiffs is in direct violation of the *John L.* mandate that, due to juvenile prisoners' lack of knowledge of their legal rights and the legal system, the law requires that they be provided with direct access to attorneys. *See* 969 F.2d at 233.

The above evidence reveals the possibility that a number of deficiencies remain in the new ODYS legal assistance program. Further, this Court is persuaded by the reasoning employed in *Cody v. Hillard*, 599 F.Supp. 1025, 1062 (D.S.D.1984) and *Skinner v. Uphoff*, 234 F.Supp.2d 1208 (D.Wyo.2002), both cases involving a court's finding that the government's voluntary cessation of allegedly unconstitutional activities at state prisons did *not* render a prisoner-plaintiff's claims moot.[25]

In *Cody v. Hillard*, plaintiffs, a class of prison inmates confined in the South Dakota State Penitentiary ("SDSP") and the Women's Correctional Facility ("WCF") at Yankton, South Dakota brought a class action suit challenging the constitutionality of numerous conditions and practices of confinement at the two prisons under the First, Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution. *See* 599 F.Supp. at 1026. Plain-

**25.** Plaintiffs also rely on *EEOC v. Peterson, Howell & Heather, Inc.* as a case in which a court found that the government's voluntary cessation of allegedly unconstitutional activities did *not* render plaintiff's claim moot. *See* 702 F.Supp. 1213, 1227 (D.Md.1989) (defendant's post-complaint actions did not remedy the effects of past discrimination and did not render plaintiffs' claims moot). *EEOC*, however, is easily distinguishable in that it is a Title VII case, not a prison case. *See* 702 F.Supp. at 1213. Where courts are hesitant to scrutinize prison administrators, "[i]n the context of a Title VII action, the quality and permanence of nascent Title VII compliance efforts conducted in response to litigation must be *carefully scrutinized* by courts." *Id.* at 1227 (emphasis added). *EEOC*, therefore, involves a less deferential standard of review than is required in the case sub judice. *See* 702 F.Supp. 1213.

tiffs sought declaratory and injunctive relief. *Id.* at 1027. After a seven-day trial where various experts on both sides presented testimony, the district court concluded that most of plaintiffs' claims were supported by sufficient evidence. *Id.* The court found that though the prison administrators continued to make "dedicated good faith efforts to improve the conditions of confinement at the prison[s]," they had failed to meet their burden of showing that these improvements had eradicated any and all of plaintiffs' allegations. *Id.* at 1062. The court reasoned, "[t]his court is well aware of the financial restraints placed on defendants, but the good will shown by them cannot serve as a defense to a failure to provide minimum constitutional standards. If the state wishes to hold the inmates in institutions, it must provide the funds to maintain the inmates in a constitutional manner." *Id.* Thus, holding that the "totality of conditions of confinement at the SDSP ... subject[ed] the plaintiff class to cruel and unusual punishment in violation of the [E]ighth and [F]ourteenth amendments," the *Cody* court ordered defendants to file a proposed plan to change or modify the conditions of confinement, to be approved by the court. *Id.* at 1062.

*Cody* stands for the notion that where a prisoner-plaintiff establishes a possible constitutional violation, and where the prison system has failed to ameliorate that potential constitutional violation on its own, a court may step in to ensure that the violation *does not* and *cannot* continue. Although Plaintiffs' single denial-of-access is not as shocking as the *Cody* plaintiffs' twenty-page list of unconstitutional conditions of confinement, it is the substance of that claim that matters, not its scope. Accordingly, though *Cody* involved a certified class action, approximately twenty pages of specific allegations of unconstitutional conditions, and protracted litigation which

allowed the *Cody* court to base its decision on a substantial record, the Court finds that, here, as in *Cody*, Plaintiffs' allegations concerning Defendants' continuing violations of their constitutional rights warrants this Court's interference.

In *Skinner*, an inmate serving a sentence in the Wyoming State Penitentiary ("WSP") sued on his own behalf, and on behalf of a certified class of current and future inmates of the prison, alleging that the "policies, practices, and customs of Defendants place the inmates at the risk of unprovoked assault, bodily injury, and death at the hands of other inmates." *See* 234 F.Supp.2d at 1210. When he arrived at WSP, he was not afforded his request of protection by the prison administrators and wound up being beaten so badly by his fellow inmates that he spent five weeks in the prison infirmary. *Id.* at 1211. Plaintiff claimed that WSP pursued "policies and customs that created the substantial risk of bodily harm to inmates at WSP and that evidence[d] a deliberate and gross failure to supervise their subordinates." *Id.* at 1211–12. Further, plaintiff submitted substantial evidence in support of his assertions, including evidence that though the prison had a Serious Incident Review ("SIR") policy under which prison officials were directed to conduct an investigation after the occurrence of an assault, in the six years since that policy had been instituted, there had been between one hundred to three hundred assaults, and only three investigations. *Id.* at 1214. In ruling on various motions by both parties, the court found defendants' argument that the new interim WSP policies, including the SIR policy, had ameliorated the alleged problems to be meritless, and held that plaintiff had established that he could show a likelihood of a continuing violation necessary for declaratory and injunctive relief at trial. *Id.* at 1216.

The *Skinner* court found that "[r]egardless of what claims [d]efendants make now regarding their contrition and resolve to improve in the future, they have established a clear pattern of deliberate indifference ... *New and improved policies are meaningless if they are not followed.* Up to this point, there is simply no evidence that such good-faith supervision, training, and enforcement efforts are underway." *Skinner*, 234 F.Supp.2d at 1215 (emphasis added). Although in this case, Defendants' efforts to improve the ODYS legal assistance program may not echo the *Skinner* defendants' "deliberate indifference," until Defendants successfully eliminate the alleged constitutional violations taking plus at ODYS facilities, their policy changes, like those in *Skinner*, may be considered "meaningless."

Based on the above analysis, it appears that at least one year of "experimentation" later, Defendants' attempted reforms do not provide ODYS inmates with meaningful court access. Further, both *Cody* and *Skinner* provide support for the notion that where prison administrators have not prevented a prisoner's constitutional rights from being impinged upon, courts may step in as an arbiter of justice. Even so, this Court is aware of the Supreme Court's directive in *Lewis*, limiting the "intrusion" of the federal courts into issues of prison administration:

> It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur. Of course, the two roles briefly and partially coincide when a court, in granting relief against actual harm that has been suffered, or that will imminently be suffered, by a particular individual or class of individuals, orders the alteration of an institutional organization or procedure that causes the harm. But the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subjected to a governmental institution that was not organized or managed properly.

*See Lewis*, 518 U.S. at 349–50, 116 S.Ct. 2174. The Supreme Court claims that deference to the prison administration is necessary,

> if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.

*Id.* at 361, 116 S.Ct. 2174 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)).

Accordingly, balancing the *Lewis* directive against the real possibility that Defendants' efforts to provide Plaintiffs with their right to court access has been ineffective thus far, the Court finds that Plaintiffs have established that their case is worthy of judicial intervention. Though Plaintiffs have not established definitively that Defendants' efforts at reform have been *wholly* unsuccessful, they have certainly demonstrated that a question of material fact exists as to whether Defendants have met their "heavy burden" of showing that there is "no reasonable expectation that [the denial-of-access] will be repeated." *Grant* at 633, 73 S.Ct. 894. Thus, while noting the "strong consider-

ations of comity that require … giving States the first opportunity to correct the errors made in the internal administration of their prisons," this Court preserves the issue of voluntary cessation for trial.

## C. Whether T.M. Failed to Exhaust His Available Administrative Remedies

■ Finding both that T.M. has standing and that T.M.'s claims are not moot, the Court must now consider whether T.M. exhausted his administrative remedies.

The Prison Litigation Reform Act ("PLRA") requires district courts to screen prisoner complaints in order to dismiss those that are frivolous, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. *See Jackson v. Gill*, 92 Fed.Appx. 171, 172 (6th Cir. 2004) (citing 28 U.S.C. § 1915A(b)). Accordingly, the PLRA includes a strict exhaustion of administrative remedies clause, which states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement applies to all inmate suits about prison life, [and] an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." *See Porter v. Nussle*, 534 U.S. 516, 523–24, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner*, 532 U.S. 731, 741, n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Further, the requirement is not discretionary and permits no exceptions. *See Pack v. Martin*, 174 Fed.Appx. 256, 261 (6th Cir.2006) (citing *Porter*, 534 U.S. at 516, 122 S.Ct. 983). In all cases, the plaintiff-prisoner has the burden of proving that a grievance has been fully exhausted and must attach documentation to the complaint as proof. *Baxter v. Rose*, 305 F.3d 486, 488 (6th Cir.2002); *but see, Boyd v. Corrections Corp. of Am.*, 380 F.3d 989, 995 (6th Cir.2004) (a "prisoner-plaintiff may bear his pleading burden either 'by attaching a copy of the applicable administrative dispositions to the complaint or, in the absence of written documentation, describ[ing] with specificity the administrative proceeding and its outcome …' ").

The Sixth Circuit has interpreted the PLRA's exhaustion requirement as satisfied where a plaintiff files a grievance that both grants the prison "fair notice" of the claim and appeals the denial of the grievance to the highest possible level. *Pack*, 174 Fed.Appx. at 261 (citing *Thomas v. Woolum*, 337 F.3d 720, 727, 733 (6th Cir. 2003)). To give fair notice of a claim, a plaintiff must allege "specific acts of mistreatment or misconduct, and identify the responsible party." *Id.* (citing *Burton v. Jones*, 321 F.3d 569, 575 (6th Cir.2003)) (noting that "it is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint"). As the Sixth Circuit explained in *Thomas*, although under the fair notice standard, the prison must have the first opportunity to resolve a plaintiff's problems, if the prison declines to address the problems for procedural reasons, the plaintiff should not be penalized. *Id.; Thomas*, 337 F.3d 720, 734 (noting that if the prison is provided with fair notice of a plaintiff's problems and declines to address the problems for procedural reasons, the plaintiff should not be penalized). Moreover, the PLRA only requires exhaustion of *available* remedies. *Pack*, 174 Fed. Appx. at 262. While this requires plaintiffs

to use grievance procedures even where they believe the procedure to be ineffectual or futile, it does not require a plaintiff to use remedies which are not "reasonably available." *Id.; Boyd*, 380 F.3d at 993 (concluding that administrative remedies are exhausted when prison officials fail to respond timely to a properly filed grievance).

Though ODYS has extensive written material for youth and ODYS administrators setting forth the details of the ODYS grievance process,[26] "[v]ery few courts have addressed what [specific] things an administrative grievance must contain...." *See Strong v. David*, 297 F.3d 646, 649 (7th Cir.2002). It is undisputed, however, that though some circuits, such as the Seventh Circuit, require prisoners to comply with a simple "notice pleading"-type standard, the Sixth Circuit is more strict, demanding that a prisoner's griev-

ance "name each person who ultimately becomes a defendant." *See Curry v. Scott*, 249 F.3d 493, 504–05 (6th Cir.2001); *but see, Strong*, 297 F.3d at 649–50 (noting that in the Seventh Circuit, a grievant "need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some assorted shortcoming.").

Defendants assert that because T.M. never filed a grievance specific to his claim that he was denied access to the court system, under the strictures of the PLRA's exhaustion requirement, he cannot now pursue his forward-looking denial-of-access claim. *See* Defs.' Supp. Memo at 14, n. 7; Decl. Jeffrey L. Rollins, Human Services Program Administrator for MJCF at 1–2.[27] Plaintiffs counter that because in filing his now-exhausted assault grievance, T.M. requested that his claim

---

**26.** *See* "Youth Grievance Process," ODYS Policy No. 304.03 (Aug. 1, 2005) (the "Policy"). The Policy provides a step-by-step directive for administrators dealing with inmate grievances. *See* ODYS Policy No. 304.03 §§ IV.B–E ("Procedures"). Further, the Deputy Director, the Division of the Chief Inspector, the Deputy Director of Legal Services, the Deputy Director of Treatment and Rehabilitation Services, and the Deputy Director of Corrections annually review the Policy. *Id.* § VI ("Monitoring"). In order to ensure that ODYS inmates are aware of and understand the Policy, Youth are provided with the following Policy attachments: (1) Policy No. 304.03.-A.—"Youth Grievance Handbook"; (2) Policy No. 304.03.B.—"Letter of Understanding"; and (3) Policy No. 304.03.C—"Youth Grievance Form." *See id.* § VI ("Monitoring").

**27.** Some courts have held that a certified class of prisoner-plaintiffs satisfy the PLRA's administrative exhaustion requirement through "vicarious exhaustion," that is, when one or more class members has exhausted his administrative remedies with respect to each claim raised by the class, all class members are considered to have exhausted their claims. *See, e.g., Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir.2004) (finding that when "one or more class members ha[s] exhausted

his administrative remedies with respect to each claim raised by the class," vicarious exhaustion applies); *see also Hattie v. Hallock*, 8 F.Supp.2d 685, 689 (N.D.Ohio 1998) (noting that the "doctrine [of vicarious exhaustion] is only available to plaintiffs in a class-action lawsuit, where a class is certified pursuant to Fed.R.Civ.P. 23(b)(2)."). The courts reasoned that the rule "advances the purpose of administrative exhaustion," and reduces the burden on prisoners. *Id.* Further, courts have found that in these types of cases, "where the composition of the class is subject to constant change beyond the class members' control, it could be extraordinarily difficult for all class members to exhaust administrative remedies before filing suit." *Id.; see Jones v. Berge*, 172 F.Supp.2d 1128, 1133 (W.D.Wis.2001) ("[T]he transfer of just one additional inmate to the institution intermittently would prevent a class-action suit from ever being filed ..."). The Court notes, however, that, in the case sub judice, because the Court denied class certification in its previous opinion, and because T.M. is the sole remaining named Plaintiff, Plaintiff cannot rely on the "vicarious exhaustion" doctrine to save T.M.'s claims.

be resolved "in court," he successfully complied with the PLRA's requirement that he put Defendants on notice that he wanted access to the courts.

In their Motion in Opposition, Plaintiffs argue that when the underlying conditions included in a grievance remain the same, prisoners who have exhausted one full round of the grievance process need not file subsequent grievances about the same issue. *See Aiello v. Litscher*, 104 F.Supp.2d 1068, 1074 (W.D.Wis.2000) (finding that plaintiffs' failure to use the external administrative procedure as well as the internal procedure under the Wisconsin Administrative Code did not constitute a failure to exhaust his administrative relief); *Lewis v. Washington*, 197 F.R.D. 611, 614 (N.D.Ill.2000) (finding that "plaintiffs have done enough if they have exhausted their remedies with regard to their placement in Category IV in part because of the allegedly illegal conditions in effect there. They need not have done so with every separate beef they have with the operation of Category IV."); *Johnson v. Johnson*, 385 F.3d 503, 521 (5th Cir. 2004) (inmate who had been repeatedly assaulted "could not have been expected to file a new grievance every fifteen days, or every time he was assaulted" and that, in such circumstances, prisoners "need not continue to file grievances about the same issue").

Nonetheless, the cases upon which Plaintiffs rely fail to support their argument in that none of them presents the same factual scenario as T.M.'s case. First, unlike the prisoner in *Aiello*, T.M.'s case has nothing to do with a distinction between internal or external procedure. *See* 104 F.Supp.2d at 1074. Second, unlike the prisoners in *Lewis* and *Johnson* whose multiple grievances all targeted the *same* issue, T.M.'s second claim, though *related* to his assault claim, raises a new issue—

denial-of-access. 197 F.R.D. at 614, 385 F.3d at 521. Though it is true that "if a prisoner were complaining about the frigid conditions of his cell, it would make little sense for that prisoner to be required to continually file grievances stating that his cell remains cold," the analogy would only be applicable to T.M.'s situation if he were continually filing multiple *assault* grievances. *See* Pls.' Opp. at 13.

Thus, finding Plaintiffs' initial arguments unconvincing, the Court considers the following question: Does a juvenile inmate who puts prison administrators on notice that he wishes to have an administratively exhausted claim resolved "in court," exhaust his remedies for a denial-of-access claim when it is undisputed that at the time he grieved, the prison had no mechanism to provide its juvenile inmates with attorney access, and, therefore, access to the courts? The Court has thoroughly reviewed case law relating to the PLRA's exhaustion requirements, and it is evident that the precise question is one of first impression in the federal courts.

As a threshold consideration, the Second Circuit's analysis in *Brownell v. Krom* is instructive. *See* 446 F.3d 305, at 311, n. 1 (2d Cir.2006). In *Brownell*, plaintiff, Brownell, an inmate at Shawangunk Correctional Facility ("Shawangunk"), sued defendants, prison administrators, under 42 U.S.C. § 1983, alleging that the defendants had denied him his right of access to the courts by "intentionally losing his legal documents and other personal items while transferring him between correctional facilities." *See id.* at 307. According to Brownell, in the course of relocating him to two different facilities, prison guards lost eleven bags of his personal property. *See id.* at 306.

Soon after Brownell realized that his property was missing, he filed a "Lost Property Reimbursement Claim," which

prison administrators denied for "lack of documentation." *Id.* at 308. Though the New York Department of Correctional Services ("NYDOCS") allows prisoners the opportunity to appeal a denial of their lost property claims to either the facility superintendent or the central office, instead of following the appeals process, Brownell filed a separate "Inmate Grievance Complaint" challenging · said denial. *Id.* The grievance included a list of all of Brownell's missing property as well as Brownell's request that the facility find his lost property "via a thorough investigation." *Id.* at 309. Prison administrators denied Brownell's grievance and recommended that Brownell file a second "Lost Property" claim. *Id.* It was undisputed that Brownell successfully exhausted the NYDOCS administrative grievance process. *See id.*

Brownell subsequently filed suit in federal court, alleging that the defendants had intentionally failed to document and account for his property during his facility transfers, and arguing that these actions were in retaliation for his possession of unauthorized legal documents, which he intended to use to file a *habeas* petition based upon alleged "prosecutorial misconduct." *Brownell v. Krom,* 2004 WL 2516610, at *2 (S.D.N.Y. Nov.8, 2004). The district court granted summary judgment for defendants, explaining that Brownell had not properly pursued the administrative procedures to redress the conduct alleged in the complaint because during the administrative process, Brownell had failed both to name the defendants and to grieve separately that he was being denied access to the courts. *Id.* at *6.

On appeal, the Second Circuit reversed the district court's decision and remanded the case to the district court. *Brownell,* 446 F.3d at 313. The Second Circuit held that "special circumstances" justified Brownell's noncompliance with the PLRA, namely the prison officials' error in refusing to investigate the circumstances underlying Brownell's lost property claim. *Id.* The court also found that· after Brownell had conducted his own investigation to determine the whereabouts of his lost property, prison officials had erred by failing to inform him that he could raise any new facts he discovered in his administrative proceedings. *Id.* Further, though the district court had found that Brownell's failure to claim separately that he was denied his right to access to court in his initial grievance rendered that claim unexhausted, the Second Circuit disagreed, noting,

> [w]e do not, however, agree with the district court that ·Brownell's failure to claim in his grievance a denial of his right of access to the courts renders the claim before us unexhausted ... As a general matter, a prisoner need not articulate legal theories in his grievance to exhaust administrative remedies under the PLRA.

*See id.* at 311, n. 1. The Second Circuit's rationale provides support for the notion that even under the strictures of the PLRA, there may be "special circumstances" where prisoner-plaintiffs are afforded flexibility sufficient to meet the goals of the PLRA.

Moreover, the Sixth Circuit's treatment of a prisoner's untimely claims in *Thomas v. Woolum* demonstrates that the PLRA's exhaustion requirements should not be used to frustrate legitimate prisoner claims. *See* 337 F.3d at· 720. In *Thomas,* plaintiff Thomas, a state inmate, sued one corrections officer for assault and three other officers for allegedly failing to protect him from being beaten. *See id.* The district court dismissed Thomas' failure-to-protect claims against the three officers for failure to exhaust. · *Id.* On appeal, the Sixth Circuit affirmed the district court's

dismissal, explaining that Thomas' complaint raised *new* claims, which he had not set forth in his initial grievance. *Id.* at 734.[28] The *Thomas* court found, however, that Thomas was unfairly penalized when the district court declined to address Thomas' exhausted claims because they were procedurally "defective," i.e. untimely. *Id.* at 725–26. The court reasoned:

> The exhaustion requirement is therefore a benefit accorded to state prisons, an opportunity to satisfy those inmate grievances the state wishes to handle internally. It is "an accommodation of our federal system designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." It is not, however, *designed to permit state administrative timelines to handcuff the federal courts in adjudicating cases involving important federal rights* ... [B]y filing, ... Thomas received the benefit of the potential that the state would hear his grievance ... [and] the state received the benefit of dealing with the case internally if it so desired.

*Id.* at 726–27 (emphasis added). The court held that where defendants have "fair notice" of a plaintiff's claims but fail to respond, a plaintiff's failure to follow proper procedure in filing his grievance is not fatal to those claims. Under *Thomas,* then, the pivotal inquiry in assessing the adequacy of a prisoner's PLRA claim is whether prison officials had "fair notice" of that claim.[29]

---

**28.** The Sixth Circuit explained,

> Thomas argues that between his official grievance form and his cooperation with the prison's Use of Force investigation, in which he specifically mentioned the presence of other officers who failed to protect him, he gave prison officials sufficient notice for them to address his concerns in the grievance process. True though that may be, *our cases require more.* Because Thomas made no reference to the issues involved in his failure-to-protect claim in his grievance, we must find that he failed to exhaust his administrative remedies with respect to the claims against Kepler, Starcher, and Waddell [the officers he alleges "failed to protect him"]. Thomas's grievance form does not offer the kind of information that our precedent requires for exhausting his claims against Kepler, Starcher, and Waddell. Thomas' grievance mentions neither the defendants themselves nor any facts suggesting that officers other than Woolum knew anything of the incident.

*Thomas,* 337 F.3d at 734. The Court notes that the above discussion is helpful to T.M. in that in consistently requesting an attorney, he, unlike Thomas, could be found to have offered "the kind of information" required for exhausting his claims.

**29.** Further, this Court also notes that the Sixth Circuit has recently overruled its 2004 decision in *Bey v. Johnson,* which adopted a "total exhaustion" regime for prisoners' "mixed complaints." *See Spencer v. Bouchard,* 449 F.3d 721 (6th Cir.2006) (citing *Bey v. Johnson,* 407 F.3d 801 (6th Cir.2005)). The "total exhaustion" rule authorizes dismissal without prejudice of a "mixed complaint," containing both exhausted and unexhausted claims. *See Bey,* 407 F.3d at 806. In *Spencer,* the Sixth Circuit reconsidered the issue, and adopted the "partial exhaustion rule" under which a court may hear a prisoner's exhausted claims, while dismissing without prejudice only his unexhausted claims. *Id.* at 805–06 (declaring that "the partial-exhaustion rule is the law of this circuit") (citing *Salmi v. Sec'y of Health & Human Servs.,* 774 F.2d 685, 689 (6th Cir.1985); 6TH CIR. R. 206(c) (a later panel cannot overrule a prior panel's published opinion)). Therefore, the Sixth Circuit's previously strict interpretation of the exhaustion requirement, which punished prisoners who filed "mixed complaints" by dismissing their claims altogether, is no longer good law. This shift from a "total exhaustion" to a "partial exhaustion" rule is admittedly not tantamount to the Sixth Circuit's adopting a "relaxed" view of the PLRA's exhaustion rules. *It does, however, provide* support for the notion that where an inmate files multiple claims, his potentially meritorious claims will not be overlooked simply because he has not complied fully with proper administrative procedure.

In addition, this Court finds T.M.'s status as a juvenile inmate to be an integral element to its exhaustion analysis. As established in *John L.*, the Sixth Circuit has held that juvenile inmates differ from adult prisoners in that their young age, their lack of experience with the criminal system, and their relatively short period of confinement entitle them to greater protection from the state. *See* 969 F.2d at 234 (noting that because of the young age and lack of knowledge, juvenile inmates must be afforded access to an attorney to allow them "meaningful access to the courts"). The Court explained that due to the myriad of confusing rules and policies inherent in prison administration, to hold otherwise would effectively impede juvenile inmates' right to access. *See Corpus v. Estelle*, 551 F.2d 68, 70 (5th Cir.1977) (states may not erect barriers that impede the right of access of incarcerated persons). By extension, T.M., as a juvenile inmate and a ward of the state, requires special attention and assistance from ODYS.

When, on October 16, 2004, T.M. first asked for resolution of his assault claim "in court," as a juvenile who was unfamiliar with the legal system, he could not and did not know the legal ramifications of his demand. Specifically, he was unaware that under *John L.*, his request for "court access" amounted to a request for an attorney. *See* 969 F.2d at 234. He knew only that he wanted his claim to be dealt with outside the realm of standard ODYS administrative procedures. Thus, as long as he had given ODYS "fair notice" of his request, it was then incumbent upon ODYS to meet his demand. *Id.* (citing *Bounds*, 430 U.S. at 822, 97 S.Ct. 1491 (holding that prison officials must assure that inmate access to the courts is adequate, effective and meaningful)).

Defendants assert that T.M.'s request that his assault grievance be heard "in court," failed to provide them with "fair notice" that he wanted court access. The Court, however, finds Defendants' contentions to be disingenuous. First, it is undisputed that on December 15, 2004, when T.M. had still not been informed about how ODYS was handling his assault grievance, he wrote a follow-up letter to the Chief Inspector asking for an update. *See* Defs.' Ex. 5, T.M. Aff. ¶ 13. Thus, assuming *arguendo* that his initial grievance did not provide ODYS with "fair notice," T.M. reasserted the same court access request in his follow-up efforts. Second, Defendants assert that from October 2004 until T.M.'s retention of Doughten in April 2006, they consistently tried to meet his request for an attorney. Defendants cannot have it both ways. They cannot, on the one hand, argue that they were not "on notice," while at the same time asserting that they had done all they could to provide T.M. with counsel.

Accordingly, this Court finds that T.M.'s failure to file a separate written denial-of-access is akin to a "procedural defect." *See Thomas*, 337 F.3d at 720. Though he arguably failed to follow the technical requirements of ODYS' procedures, ODYS still received ample notice that he wanted access to the courts. Under *Thomas*, such procedural defects are not fatal to a prisoner's claim when the prison administrators, having fair notice, fail to respond. *Id.* Thus, in this case, where ODYS, having fair notice of T.M.'s request for court access, violated his legal rights, it is Defendants, not T.M., who should be held responsible. To find otherwise, would contravene *John L.*'s mandate providing special protection for juvenile prisoners.

Taking into consideration the foregoing case-law, in addition to T.M.'s status as a juvenile inmate, this Court finds that under the circumstances, T.M.'s request that

his assault claim be resolved "in court" meets the PLRA's administrative exhaustion requirements. Hence, finding that T.M. has exhausted his claims, this Court **DENIES** Defendants' third motion for summary judgment.

## V. CONCLUSION

For the foregoing reasons, the Court finds that: (1) T.M. has standing to assert his forward-looking denial-of-access claim; (2) T.M. has no standing to assert his backward-looking denial-of-access claim; (3) Plaintiffs have failed to provide sufficient evidence to show that they are entitled to the "capable of repetition yet evading review" mootness exception; (4) Plaintiffs have raised a question of material of fact as to whether Defendants' "voluntary cessation" of their allegedly unconstitutional behavior has mooted T.M.'s claims; and (5) by requesting that his "assault claim" be resolved "in court," T.M. put Defendants on notice of his denial-of-access claim, and, therefore, exhausted his administrative remedies. Accordingly, the Court **DENIES** Defendants' Third Motion for Summary Judgment, preserving T.M.'s forward-looking denial-of-access for resolution at trial.

Accordingly, this Court lifts its previously issued stay of discovery to allow Plaintiffs the opportunity to pursue an investigation into Defendants' recent efforts to reform the ODYS legal access program. Moreover, though the parties have already fully briefed the issue of Class Certification, the Court orders Plaintiffs to file an Amended Motion for Class Certification to allow them the benefit of any new discovery material in support of that motion.

**IT IS SO ORDERED.**